UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| JAMES D. VOGEL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | 5:12-cv-11-JMH |
| v. | ) | |
| | ) | |
| E.D. BULLARD COMPANY, | ) | **MEMORANDUM** |
| | ) | **OPINION & ORDER** |
| Defendant. | ) | |

** ** ** ** **

This matter is before the Court upon the Motion for Summary Judgment of Defendant E.D. Bullard Company ("Bullard") [DE 71], in which Bullard asks the Court to determine whether, among other things and as a matter of law, it ever promised Plaintiff James D. Vogel ("Vogel") a rose garden and, even if it did, whether that was an enforceable promise. Vogel has filed a Response [DE 72] stating his objections to the Motion, and Bullard has filed a Reply [DE 75] in further support of its Motion. Having considered the matter carefully in light of the undisputed facts and the relevant law, the Court concludes that, as a matter of law, the claims stated in Plaintiff's Amended Complaint [DE 60] are without merit and shall be dismissed.

**I.  Background**

Defendant Bullard is a maker of fire and safety

equipment, which markets and sells its products on an international level. Plaintiff Vogel was contacted in September 2010 by an executive recruiter, retained by Bullard in an effort to recruit Vogel to leave his employment of eleven years and become an employee of Bullard. The recruiter interviewed Vogel in Minnesota, where he resided and worked, in October 2010. After several follow-up communications with the recruiter, Bullard invited Vogel to interview with personnel in Kentucky in November and December 2010. At that time, Bullard provided him a job description for the position for which Vogel was being recruited – Vice President of Marketing and Sales. The job description set forth the specifics of the position, including "tak[ing] the lead in managing, training and motivating approximately forty marketing and sales professionals and support staff around the world," and stated that Bullard was a "team-oriented environment" where work was "fun," and where there were "great colleagues to work with." An organizational chart was also provided to Vogel which depicted that all of Bullard's marketing, sales, and customer service functions reported to the Vice President of Marketing and Sales and that the position would oversee marketing, sales, and customer service functions on a global level.

2

During the recruiting process, Bullard touted the lucrative financial opportunity presented to Vogel, including short-term and long-term incentive compensation that was available after employment for the requisite time, as well as the authority and automony that he would have as the global head of Bullard's Marketing and Sales activities; the substantial time, support, and guidance he would receive in order to learn the company's organization, processes, strategies, and staff during Chief Executive Officer Richard Miller's ("Miller") two-year transition into retirement; and the supportive and positive atmosphere and culture which existed at Bullard. President and Chief Operating Officer Eric Pasch ("Pasch") represented to Vogel that he would be "debt free in a few years" of employment because of the compensation that would come his way if he joined the company. During the recruiting process, Miller and Pasch explained to Vogel that it would take six to twelve months for him "to get to know the business" and that he would use that time to absorb the business, products, and culture, before making appropriate marketing and sales changes." Miller promised Vogel that his "main focus [would] be to offer support and guidance to the new Vice President of Marketing and Sales during" the two year period prior to his retirement.

3

Vogel interviewed with Miller, Pasch, and Linda Huesing, Bullard's Director of Human Resources during his first round of interviews, in November 2010. Huesing told Vogel that Deborah Kenny, the past prior Vice President of Marketing and Sales, had left because she was not a "good fit" and that she had left based on a "mutual agreement." In response to Vogel's inquiries about the culture, atmosphere, and environment at Bullard, Huesing noted that it was a "roll-up your sleeves" place, that employees at all levels interacted with the senior management, and that it was a non-union environment.

On December 29, 2010, Bullard invited Vogel to Lexington to interview with its owner and the Chairman of the Board, Edward "Jed" Bullard. In that interview, Vogel was informed that he would spend the first six to twelve months of his employment assessing the organization, processes, strategies, and staff issues at Bullard to determine what was needed at the company and who would be reporting to him at the conclusion of that year. Pasch has testified that Bullard represented to Plaintiff that the "global" duties of the Vice President of Marketing and Sales would include international responsibility "over time," that he would reach responsibility for "worldwide" sales and marketing through "steps."

4

On December 30 and 31, 2010, Pasch and Vogel engaged in telephone conversations, while Vogel was at his Minnesota residence, to discuss the terms of Vogel's prospective Employment with Bullard. Pasch and Vogel exchanged emails which included revised offers of employment to confirm the "principal elements" of the offer to Vogel. Vogel received and accepted his final offer of employment while he was in Minnesota.

In their offer of employment, memorialized in a later dated December 30, 2010, Bullard represented that he would receive a bi-weekly salary of $7,602.31, annualized to $200,000.00. He would participate in the Short Term and Long Term Management Incentive Programs as set forth in a memorandum describing those benefits.[1] Vogel offered to pay for a number of relocation expenses, including "temporary living expenses up to $2,400 per month for up to six months or the end of September if needed." There was also a "[s]igning bonus of $20,000 (taxable as ordinary income,

---

[1] The short-term incentive plan memorandum which governed that benefit states that "[p]ersons terminating employment prior to the date of incentive payments will forfeit any awards." In addition, the plan documentation notes that "[n]ew employees with at least six months' service will be eligible (subject to the terms of eligibility…) for pro-rata awards." The long-term incentive program documents include a similar provision, stating that "[c]ertain executive managers… who have held their current positions for a period of not less than one year will be eligible to participate in the Plan, subject to nomination by the Chief Executive Officer and approval of the Company's Board of Directors." The memorandum goes on to state that "[j]ob title alone does not guarantee participation of any employee in the Plan."

payable 30 days after your start date . . . and subject to full repayment to the Company should you voluntarily terminate your employment within two years of yours tart date." Other elements of the offer included "[f]our weeks of paid vacation plus eleven paid holidays (includes three personal 'holidays' of your choosing)." Bullard also promised him a performance and salary review within a year from his employment date, among other things. Plaintiff concedes that he did not raise the issue of whether his employment was at-will or for a term in his pre-employment negotiations.

In an email sent after Vogel agreed to join Bullard, Miller wrote that he would "join with Eric [Pasch] to support you in every way I can and in any way you need." He further indicated that he and Pasch would "do all we can to help make the transition as smooth as possible." *Id*. Bullard further encouraged him to accept the offer, writing that it saw "only positive outcomes should you honor us by joining the Company" that, while "[t]here [would] be plenty of hard work . . . this hard work will be conducted in a supportive and positive environment with colleagues who have a passion for what they do and even have a little fun along the way!"

Vogel accepted the offer and came to work at Bullard. Once there, he received Bullard's Employee Handbook, which Vogel acknowledged that he received on January 19, 2011, stating, among other things, that "[v]acation is accrued weekly." Also, about a month after Vogel commenced his employment at Bullard, he was presented with a document entitled "Agreement" and was asked to sign it before receiving the $20,000 signing bonus. He did so. The Agreement effectively modified the parties' agreement concerning the repayment of the $20,000 signing bonus, providing for it in the event of Vogel's voluntary departure from the company or "if Bullard terminate[d] his employment for cause within two years after his hire date," reserving to Bullard the sole judgment of whether Vogel's termination was "for cause." The Agreement further provided that Plaintiff "underst[ood] that by accepting the signing bonus this is fully sufficient consideration for entering into this agreement." Finally, the Agreement provided that Vogel "had the opportunity to review the Agreement with legal counsel" and that he "underst[ood] each provision." Pasch specifically pointed out the change in the language from the original offer letter and, aware of the change in the language, Vogel signed the Agreement anyway.

7

As it happened, once he arrived at Bullard, Vogel found that there was no one to escort him around the office or introduce Vogel to key members of the organization and discuss the business of Bullard with him. Pasch later informed Vogel that he was upset with Miller because Pasch "did not have time" to do so after Miller "dumped his workload" on Pasch, who was, at that time, the new president of Bullard. Vogel was only able to arrange a small number of meetings with Miller to discuss the business of and his role at Bullard during what ended up being his five months of employment at Bullard. After Vogel's first week of employment with Bullard, Pasch directed Vogel that he should not go to Miller "for anything" without first seeking answers from others, and then only if he first involved Pasch. When Vogel did go to Miller for information, Pasch exhibited displeasure with Vogel for having done so.

Vogel informed Pasch of his desire to have weekly meetings with Pasch to learn more about Bullard's business and to receive his feedback and guidance concerning his work and observations. Within a couple of weeks, Pasch informed Vogel that he did not want to have regularly scheduled meetings with him because he found them to be

"too constraining." Vogel had the impression that Pasch was always extremely busy or had more important things to do than to meet and speak with Vogel. For example, Pasch worked on other activities on his computer or read other documents during meetings with Vogel and others. Ultimately, Vogel explains that the vast majority of what he learned about Bullard's business, personnel, processes, customers, markets, distributors and products derived from persons other than Miller and Pasch.

Vogel often found himself at odds with Pasch once he moved to Bullard. Vogel did not support terminating Tom Korb as Bullard's Director of Marketing so soon into Vogel's employment tenure, but Pasch overruled him and directed that Mr. Korb be terminated. He felt that Pasch's management style involved bypassing management levels to go numerous lower levels into the organization to become involved in or make or change decisions without including or communicating with other appropriate levels in the management chain of command. Pasch excluded Vogel from meetings involving personnel in his marketing and sales group, which undermined Vogel's ability to run his group and caused him to feel out of the loop  Vogel felt that Bullard's culture fostered a concern about "who [would] be fired next."  Pasch informed Vogel on numerous occasions

9

that he was considering "getting rid of" numerous personnel in the company. Pasch also spoke disparagingly about numerous employees of Bullard and Bullard's owner and Chairman of the Board.

Vogel was thrust into an extremely challenging environment – where significant personnel changes were taking place within his group – and felt that he was given no genuine opportunity to lead the marketing and sales activities which he was experienced and well-equipped to perform.   Given that, everything came to a head in June 2011.   On June 24, 2011, Pasch asked Vogel if he was "happy" that he joined Bullard.   Vogel informed Pasch that (given Pasch's micromanagement), he was not sure that he was wanted or needed.    In response to Pasch's inquiry, Vogel informed Pasch that he found his management style to be intimidating, threatening and in-your-face.  Pasch asked Vogel to meet with him again on July 6, 2011 to inform Pasch (a) whether Vogel wanted to be at Bullard, and (b) what Vogel "brought to the table" at Bullard.   In response to  Pasch's  direction,  Vogel  prepared  a  15-point presentation of what he "brought to the table" at Bullard to discuss at his meeting with Pasch on July 6, 2011. Vogel forwarded this presentation from his personal e-mail

address to himself at his Bullard e-mail address on July 6, 2011.

Vogel then attended the scheduled meeting with Pasch as well as Bullard's Director of Human Resources, Linda Huesing. Although Vogel did not provide Pasch with his "what I bring to the table" presentation which he had prepared and transmitted to himself, Pasch had a copy of the presentation, as (unbeknownst to Vogel at the time) Pasch was monitoring and intercepting Vogel's e-mail communications. When Vogel noted that Pasch had a copy of his e-mail note(s), Pasch stated that Vogel must have previously given it to him (which Vogel did not), which was an untruth. Pasch informed Vogel in the meeting that he had concluded that "Bullard is not the place for you", and he terminated Vogel's employment five months after he began employment.

Following Vogel's involuntary termination from employment with Bullard on July 6, 2011, Bullard forwarded to him an "Agreement and General Release," in which Bullard stated that Vogel had "decided to resign from employment" with Bullard, which was not true. The Agreement and General Release offered to pay Vogel for "unused" vacation hours and temporary living expenses up to $2,400 through September 2011 only if he agreed to sign the Agreement and

11

General Release.   Additionally, the Agreement and General Release offered to pay Vogel only four weeks salary "in lieu of notice", which Vogel felt was inconsistent with Pasch's representation to Vogel in pre-employment negotiations that Bullard "always takes care of employees when they're asked to leave" (which Vogel claims caused him to drop his request for a six month severance provision in his employment agreement with Bullard).   Vogel did not accept Bullard's proposed Agreement and General Release.

Ultimately, Bullard did not pay Vogel's Kentucky living expenses through September 2011.  Rather, Vogel was personally liable for these expenses during July, August, and September 2011.  Nor was Vogel paid for a number of what he saw as his unused 2011 vacation days and holidays or any severance payment.  He did not receive the benefit of either short term or long term incentive programs.  Nor did he receive the experience that he was told would be his since Bullard's Asia Pacific Sales, Europe Sales, and Customer Service areas were never a part of Vogel's reporting structure.  He also felt that he never led the sales and marketing efforts at Bullard nor was he truly the senior manager to lead the organization on all customer interfacing issues or take the lead in managing, training and motivating the approximately forty marketing and sales

12

professionals and support staff around the world. Ultimately, he had no authority beyond the United States and, internationally, Canada

He also learned after the termination of his employment that he was Bullard's fifth Vice President Marketing and Sales in the last eight years at Bullard and that his predecessor, Deborah Kenny, had her employment terminated involuntarily since she was not a "good fit," even though it was represented that she had mutually agreed to leave Bullard. Ultimately, Vogel concluded that Bullard's environment was "toxic" and that it was easy to get "poisoned."

## II.   Standard of Review

Summary judgment should be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Johnson v. United States Postal Serv.*, 64 F.3d 233, 236 (6th Cir. 1995).  The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to come forward with evidence showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).   A mere scintilla of evidence is insufficient; rather, "there must be evidence on which the jury could reasonably find for the [nonmovant]."  *Id.* at 252.   This standard requires a court to make a preliminary assessment of the evidence, in order to decide whether the non-moving party's evidence concerns a material issue and is more than de minimis.  *Hansel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996). The mere "possibility" of a factual dispute is not enough.  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

## III. Choice of Law

As an initial matter, the Court holds that Kentucky

14

law applies to the dispute at bar. Federal district courts, sitting in diversity, apply the law, including the choice of law rules, of the forum state. Thus, the choice-of-law rules of the forum state, the Commonwealth of Kentucky, govern the decision in this breach of contract case. *See Wallace Hardware Co. ., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); Banek v. Yogurt Ventures U.S.A., Inc., 6 F.3d 357, 361 (6th Cir. 1993)). With respect to the law of contracts, Kentucky courts apply the modern choice of law test, looking to which state has the most significant relationship to the transaction and the parties. *See Lewis v. Family Group*, 555 S.W.2d 579 (Ky. 1977) (abrogating the traditional rule of lex loci contractus). In tort cases, Kentucky does not apply the most significant relationship test. "The conflicts question should not be determined on the basis of a weighing of interests ... but simply on the basis of whether Kentucky has enough contacts to justify applying Kentucky law." *Adam v. J.B. Hunt Transport, Inc.*, 130 F.3d 219, 230 (6th Cir. 1997); *see also Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972)("[I]f there are significant contacts—not necessarily the most significant contacts—with Kentucky, then Kentucky law should be applied").

With respect to the contract, the most significant relationship is clearly with Kentucky and its law as to Plaintiff's breach of contract, promissory estoppel, and declaratory judgment (also a contract issue) claims. Bullard hired Plaintiff to work at its Kentucky headquarters. Plaintiff traveled to Bullard three separate times for interviews during the recruitment process. The duties expected of Plaintiff were largely explained to Vogel at Bullard's headquarters during those visits or communicated from its headquarters at other times. Plaintiff's performance, or lack thereof, of any alleged contract occurred solely in Kentucky. Bullard's alleged breaches of any contract also occurred in the Commonwealth. Bullard terminated Plaintiff's at-will employment on July 6, 2011 during a conversation that took place at Bullard. Accordingly, the Kentucky law of contracts and promissory estoppel shall apply.

Further, the Court agrees with Defendant that Kentucky law should apply with respect to the tort claims arising out of fraud. The alleged misrepresentations arose from communications with Bullard's headquarters is in Kentucky, where Plaintiff was ultimately employed. Further, Plaintiff's employment was terminated in Kentucky. At the very least, the Court concludes that any connection between

16

Minnesota and Plaintiff's tort claims is not more significant than those of Kentucky. Accordingly, the Court will apply Kentucky law in resolving Plaintiff's tort claims.

### IV.  Discussion

#### A. Breach of Contract

While the parties to this matter quibble over the nature of their agreement, there can be no doubt that the parties to this matter had an agreement concerning Vogel's employment with Bullard: an offer of employment was made and Vogel accepted, it, coming to work for Bullard. The parties disagree, however, about whether this agreement was, as Bullard insists, for Vogel's at-will employment with Bullard in exchange for certain compensation and benefits or whether it was, as Vogel insists, an agreement for employment for a two-year term during which he could only be dismissed by Bullard for cause. Vogel, however, can identify no evidence that Bullard ever intended that his employment be anything but at-will, and his claim for breach of contract fails.

In the Commonwealth of Kentucky, "a contract for permanent employment which is not supported by any consideration other than the obligation of services to be performed on the one hand and wages to be paid on the other

17

is a contract for an indefinite period, and, as such, is terminable at the will of either party." *Edwards v. Kentucky Utilities Co.,* 150 S.W.2d 916, 917–18 (1941). Where there is no clearly manifested intent to alter an employee's employment status from at-will to one where he could only be terminated for cause, the default employment relationship is "at will." *See Street v. United States Corrugated, Inc.*, 2011 U.S. Dist. LEXIS 7113, *12 (W.D. Ky. 2011) ("absent a clear statement not to terminate without cause, the assumption is that the parties intended to enter into an ordinary employment relationship, terminable at the will of either party") (citations omitted). Absent a specific contractual provision stating that discharge may only be done for cause, "an employer may ordinarily discharge an employee for good cause, for no cause, or for a cause that some might view as morally indefensible." *Miracle v. Bell Co. Emergency Med. Svcs.*, 237 S.W.3d 555, 558 (Ky. Ct. App. 2007); *see also Mayo v. Owen Healthcare, Inc.*, 2000 U.S. App. LEXIS 22257, *5 (6th Cir. 2000) (interpreting Ky. law in holding "employment is 'at will' unless the parties otherwise agree").

Plaintiff concedes that he did not raise the issue of whether his employment was at-will or for a term in his pre-employment negotiations. Nonetheless, he claims that

18

he had "an employment agreement for a definite minimum (two-year) term" based on correspondence from Rick Miller and the offer letter that he received. Neither of these documents, considered alone or together, purports to guarantee a term of employment, i.e., to change the at-will quality of Vogel's employment with Defendant. Thus, Vogel presents no evidence that would remove his contract of employment with Bullard from the general rule, and his employment was subject to termination at will.

True, Miller stated in his letter to Vogel that he would retire from the company in two years and that he would be offering Vogel his "support and guidance" during that "transition period." Further, Bullard's offer letter to Vogel does set out that certain benefits would be available to Plaintiff with the passage of time – participation in both short-term incentive compensation in 2011 and long-term compensation beginning at the end of 2012; that he would have "[f]our weeks of paid vacation plus eleven paid holidays (includes three personal 'holidays' of your choosing)" per year; that Bullard would provide him "temporary living expenses up to $2,400 per month for up to six months or the end of September [2011] if needed"; and that he would receive a salary on a biweekly basis that added up to $200,000.00 per annum. To

19

obtain the benefit of Miller's "support and guidance" and the benefits available over time, each of these provisions presupposed Vogel continued employment on the dates mentioned in order to qualify for and receive the benefits.

However, no reasonable person could conclude, without more, these statements *guaranteed* his continued employment on those dates. Without more, all employees who have the potential to benefit from the counsel of a senior management official who plans to retire after a time or who participate in benefit plans after a period of employment would have at least contract for that period of time instead of traditional at-will employment. Neither the case law nor common sense supports this conclusion.

In other words, the evidence leads to the inexorable conclusion that Plaintiff had a contract of employment – employment at-will – with Defendant. There were terms and conditions set forth to obtain compensation and benefits but none of these terms or conditions suggested that Vogel would be subject to dismissal solely for cause or that his employment was for a term certain. Thus, there is no issue to be presented to a trier of fact on his breach of contract claim. Rather, the Court concludes that summary judgment in Defendant's favor is warranted as a matter of

law with respect to Count I, Plaintiff's breach of contract claim.

### B.   KRS § 337.055

Further, the undisputed material facts do not support Defendant's contention that Bullard did not violate KRS § 337.055, as set forth in Count II of the Complaint, because it failed to timely pay him all monies—namely for his remaining vacation days for 2011 which he claims were owed at the time of his termination.  The offer of employment does not indicate that those vacation days were earned on a pro-rata basis.  They were simply provided.  The material facts do, however, support Defendant's position it was not obliged to pay him for holidays that had not yet occurred, his living expenses for at least part of July and all of August and September 2011, which were only "as needed," and short term and long-term compensation since he was not yet qualified to participate in those benefits by virtue of term of service with Bullard.  Thus, Count II must be dismissed, in part, as well.

Vogel's offer letter clearly sets forth that he would be paid his salary on a bi-weekly basis but it provides nothing with respect to the pro-ration of vacation days. Rather, it states that he would receive a certain number of vacation days and three personal holidays of his choice

21

upon employment.  Bullard's Employee Handbook, which Vogel acknowledged that he received on January 19, 2011, states that "[v]acation is accrued weekly."  It follows that since Plaintiff was not employed by Bullard for an entire calendar year, Bullard was only obligated to pay him for any accrued vacation days at the point of his termination, which it did.

Further, while the offer letter did not explicitly condition Bullard's payment of living expenses in July, August, and September 2011 on his continued employment at those times, it did provide that those expenses were to be paid "as necessary."  Once his employment was terminated, those living expenses would no longer be "necessary" and, thus, would be unowed.

Finally, the short-term incentive plan memorandum states that "[p]ersons terminating employment prior to the date of incentive payments will forfeit any awards."  In addition, the plan documentation notes that "[n]ew employees with at least six months' service will be eligible (subject to the terms of eligibility…) for pro-rata awards."  Thus, the plain language of the plan documents supplied to Plaintiff during the recruiting process shows that the offered "participation" was subject to the terms of eligibility.  Plaintiff started working at

Bullard on January 17, 2011. Bullard terminated his employment under six months later, on July 6, 2011, before the Board of Directors voted on short-term incentive compensation. Accordingly, Plaintiff was not entitled to a short-term compensation bonus. The long-term incentive program documents include a similar provision, stating that "[c]ertain executive managers… who have held their current positions for a period of not less than one year will be eligible to participate in the Plan, subject to nomination by the Chief Executive Officer and approval of the Company's Board of Directors." The memorandum goes on to state that "[j]ob title alone does not guarantee participation of any employee in the Plan." The memorandum provided to Plaintiff establishes pre-requisites for participation in the long-term incentive program. Since Plaintiff was not eligible for a long-term incentive bonus, as he had neither worked at Bullard for one year or longer nor had Pasch nominated him, those benefits can hardly be considered due and owing to Vogel.

In other words, the evidence demonstrates that Bullard paid Plaintiff all monies owed to him as of July 6, 2011, Count II fails as a matter of law.

### C. Fraud, Negligent Misrepresentation, and Equitable Estoppel

In Count III of his Complaint, Vogel claims that Bullard fraudulently induced him into leaving his former employment and accepting the offer of employment at Bullard for by a number of means. First, he argues that its agents misrepresented the culture of the company, stating that it was a "supportive and positive atmosphere" when it was not. Next, he argues that he was defrauded because he was told that he would receive the benefit of the time, support, and assistance of others at Bullard as he started his new role when, in fact, he did not. He also argues that the true scope and authority of the Vice President of Marketing and Sales position in which he agreed to serve was misrepresented to him because, while represented as "global," he ultimately realized only responsibility for marketing and sales in the United States and Canada during his tenure. Finally, he argues that he was injured because he was told that the prior Vice President of Marketing and Sales had left by "mutual agreement" as she was not a "good fit" for the company when, in fact, her employment was terminated.[2]  The Court has reviewed the undisputed evidence

---

[2] He also argues that he was inducted to enter into a contract of employment because Bullard promised him participation in short-term and long-term incentive compensation in 2011 and 2012. The Court has already determined there was no evidence of such a promise. It

and concludes that he has not identified a material representation upon which his claim of fraud may stand.

Under Kentucky law, "[w]here an individual is induced to enter into the contract in reliance upon false representations, the person may maintain an action for a rescission of the contract, or may affirm the contract and maintain an action for damages suffered on account of the fraud and deceit." *Radioshack Corp. v. ComSmart, Inc.,* 222 S.W.3d 256, 261 (Ky. Ct. App. 2007) (citing *Bryant v. Troutman,* 287 S.W.2d 920, 920 (Ky. 1956); *Faulkner Drilling Co., Inc. v. Gross,* 943 S.W.2d 634, 638–39 (Ky. Ct. App. 1997); *Adams v. Fada Realty Co.,* 202 S.W.2d 439, 440 (Ky. 1947)). Fraud is a closely circumscribed tort,

> . . .requir[ing] proof, by clear and convincing evidence, of the following six elements: (1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff. *United Parcel Service Company v. Rickert,* 996 S.W.2d 464 (Ky. 1999). The plaintiffs reliance, of

---

follows that he could not have relied upon such a promise if it was not made.

25

> course, must be reasonable, *McHargue v.*
> *Fayette Coal & Feed Company,* 283 S.W.2d
> 170 (Ky. 1955), or, as the *Restatement*
> states, "justifiable." *Restatement*
> *(Second) of Torts* § 537 (1977). The
> misrepresentation, moreover, must
> relate to a past or present material
> fact. "A mere statement of opinion or
> prediction may not be the basis of an
> action." *McHargue,* 283 S.W.2d at 172.
> This means, as the Court of Appeals
> held, that forward-looking opinions
> about investment prospects or future
> sales performance such as those
> involved in this case generally cannot
> be the basis for a fraud claim.

*Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009).

"For a declarant's misrepresentation to be used as the basis for fraud, it must relate to an existing or past fact. If the alleged misrepresentation relates to a future promise or an opinion of a future event, then it is not actionable." *Radioshack Corp.,* 222 S.W.3d at 262 (citing *Edward Brockhaus & Co. v. Gilson,* 92 S.W.2d 830, 834 (Ky. 1936); *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.,* 113 S.W.3d 636 (Ky. Ct. App. 2003); *Church v. Eastham,* 331 S.W.2d 718, 719 (Ky. 1960); *McHargue,* 283 S.W.2d at 172); *see also Brooks v. Williams*, 268 S.W.2d 650, 652 (Ky. 1954) (citing Am. Jur., Fraud and Deceit, § 35) ("It is a general rule that fraud must relate to a present or pre-existing fact and cannot ordinarily be predicated on representations

or statements that involve mere matters of futurity or things to be done or performed in the future."). Neither "puffing" nor "sales talk" qualify as actionable misrepresentations. *Flegles, Inc.*, 289 S.W.3d at 550.

Statements which indicated that the speaker believed that Bullard had a "supportive and positive atmosphere" are opinions, subjectively held by the speaker, and cannot serve as the basis for a fraud action. *See McHargue*, 283 S.W.2d at 172. Statements that Bullard and its employees planned to do "all [they could] to make [Plaintiff's] transition as smooth as possible" referred to future conduct, which cannot be a predicate for a fraud claim, any more than the other statements made to Vogel predicting that he would be debt free in a few years or that there could only be positive outcomes if Vogel joined Bullard. *See Radioshack Corp.,* 222 S.W.3d at 262; *Brooks*, 268 S.W.2d at 652.

The evidence at bar shows that Bullard represented to Plaintiff that the "global" duties of the Vice President of Marketing and Sales would include international responsibility "over time," that he would reach responsibility for "worldwide" sales and marketing through "steps." Further, Plaintiff had already assumed responsibility for marketing and sales in Canada which is

27

not part of the United States.  Thus, his responsibilities were already "international" in nature at the time of the termination of his employment.

Further, "if a party could have learned of the basis of the fraud, or if he could have uncovered it 'by ordinary vigilance or attention,' his failure to do so deprives him of a remedy." *Republic Bank & Trust Co. v. Bear, Stearns & Co., Inc.*, 707 F.Supp.2d 702, 710 (W.D. Ky. 2010) (quoting *Mayo Arcade Corp. v. Bonded Floors Co.*, 41 S.W.2d 1104, 1109 (Ky. 1931)).  Insofar as Plaintiff believes that he was misled as to the culture at Bullard or the expectations of him in the position of Vice President of Sales and Marketing, he concedes that he might have asked more questions, contacted former employees, or spoken further with then-current employees to gain the information that he now wishes that he had gained before making the decision to join the company.  Further, Plaintiff concedes that he had knowledge of the level of turnover in the marketing department and the role for which he was interviewing – prior to the time he accepted the job.  When he discussed the departure of the prior Vice President of Sales and Marketing, Debbie Kenny, with senior management at Bullard, they informed him that the former Vice President was not a good fit and that her employment had been terminated.  He

28

never sought to discuss that situation with Debbie Kenny, although he concedes that he could have done so.

For all of these reasons, Plaintiff's claim for fraud fails. Plaintiff's claim for negligent misrepresentation in Count IV fails, as well, since he has provided no evidence that Bullard supplied "false information for the guidance of [Vogel] in [his] business transactions" such that a loss was "caused to [him] by [his] justifiable reliance on the information." *Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W. 3d 575, 580 (Ky. 2004). No less, Plaintiff's claim for relief on a theory of equitable estoppel, set forth in Count V of his Complaint, fails since it requires "both a material misrepresentation by one party and reliance by the other party." *Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 62 (Ky. 2010). Counts III, IV, and V of Vogel's Complaint shall be dismissed.

**D.   Declaratory Judgment**

In Count VI of Vogel's Amended Complaint, he asks that this Court declare the rights, status, and other legal relations by and between himself and Bullard concerning obligations with respect to the signing bonus paid to him and arising out of the parties agreement as set forth in the employment letter and later agreement. Defendant argues that, as a matter of law, Vogel is obliged to repay

the full value of the signing bonus under the terms of the Agreement because he was terminated "for cause" and that, as a result, the Court should deny him declaratory relief that provides otherwise.  Vogel takes the position that he was told "Bullard is not the place for you" when his employment was terminated and, thus, he was not terminated for cause.  He also cites, as support for his position, that Pasch announced Vogel's departure from Bullard by stating that "Jim [Vogel] and I  both realized that the move to Bullard was not a good fit for him" and that "[w]e all wish him the very best and thank him for his time while at Bullard."  He argues that the "factual record before the court establishes that, at a minimum, Bullard is not entitled to summary judgment with respect to Vogel's petition for declaratory judgment."

The term "for cause" is not defined in the Agreement and, quite simply, the Court will construe a contract against its drafter in this situation.  *See B. Perini & Sons, Inc. v. Southern Ry. Co.*, 239 S.W.2d 964, 965–66 (Ky. 1951).  Here, the Court accepts that the Agreement uses plain language and that "for cause" is used in the manner commonly accepted, meaning that one is let go for a reason, because of some action or inaction unacceptable to the employer because it is illegal or in direct contravention

30

of company policy or directive from a superior – not just mere dissatisfaction with performance and nothing more, unless it is defined as such in a writing.

Certainly, Vogel has testified that, during a June 24, 2011, meeting he was advised that there were concerns about his follow-up with respect to the accidental destruction of catalogs before his tenure and ensuring the timely preparation of new catalogs for trade shows, his decision to involve others in the company in developing a strategic plan rather than proceeding on his own, his delay in researching information on competitors from publically available sources, and the fact that he was not leading. That said, Bullard's agents told Vogel that his employment was terminated because he was not a "good fit." In light of undisputed evidence that Bullard terminated him for that reason, the Court will not second guess it. The Court determines that, as a matter of law, Defendant's motion for summary judgment in its favor on Plaintiff's request for declaratory judgment in Count VI is without merit and shall be denied.

### V.   Conclusion

For all of the reasons stated above, Plaintiff's claims in Counts I through V of his Amended Complaint fail

31

as a matter of law in light of the undisputed material facts.  Count VI, alone, survives.

Accordingly, **IT IS ORDERED** (1) that Defendant Bullard's Motion for Summary Judgment [DE 71] is **GRANTED IN PART** and **DENIED IN PART.  IT IS FURTHER ORDERED** (2) that **ALL FURTHER PROCEEDINGS ARE CONTINUED GENERALLY** and (3) that defendant shall **SHOW CAUSE** why a declaratory judgment shall not be entered in favor of Plaintiff with respect to the claim in Count VI of the Amended Complaint within **twenty-one (21) days** of entry of this order.

This the 7th day of June, 2013.



Signed By:

_Joseph M. Hood_

Senior U.S. District Judge